**[Cite as *Clark v. Clark*, 2025-Ohio-159.]**

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| JAY CLARK | : | Hon. Patricia A. Delaney, P.J. |
|  | : | Hon. W. Scott Gwin, J. |
| Appellant-Cross-Appellee | : | Hon. John W. Wise, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 2024 CA 00037 |
| ARTISTIA CLARK, ET AL | : |  |
|  | : |  |
| Appellees-Cross-Appellants | : | <u>OPINION</u> |

CHARACTER OF PROCEEDING:    Appeal from the Licking County Court of
Common Pleas, Case No. 22-CV-00049

JUDGMENT:    Affirmed

DATE OF JUDGMENT ENTRY:    January 21, 2025

APPEARANCES:

For: Jay Clark

RAND L. MCCLELLAN
200 Civic Center Drive
Suite 1200
Columbus, OH 43215

For: Clark Brothers Farms

J. STEPHEN TEETOR
200 E. Campus View Blvd.
Suite 200
Columbus, OH 43235

For: Artista Clark, James Russell Arnold Jr., and Lisa Arnold

C. DANIEL HAYES
P.O. Box 958
Pataskala, OH 43062

*Gwin, J.,*

{¶1} Appellant-cross appellee Jay Clark and appellees-cross-appellants Clark Brothers Farms, Artistia Clark, Rusty Arnold, and Lisa Arnold appeal the judgment entries of the Licking County Court of Common Pleas.

*Facts & Procedural History*

{¶2} At issue in this case is a 280-acre farm in Licking County called "Clark Brothers Farms." The farm has two shareholders: appellee-cross appellant Artistia Clark ("Artie"), who is the majority shareholder with 379 shares and appellant/cross-appellee Jay Clark ("Jay"), who is the minority shareholder with 121 shares. Artie is Jay's stepmother, as she was married to Jay's father Roger Clark ("Roger") for twenty-five years before Roger's death in 2014. Artie has two children, appellees-cross-appellants Rusty Arnold ("Rusty") and Lisa Arnold ("Lisa").

{¶3} When Roger died in 2014, he owned the majority of the shares in Clark Brothers. Roger's will specifically provided that his shares were to go to Artie and, if Artie predeceased him, the shares would go equally to Jay, Rusty, and Lisa. No one challenged Roger's will.

{¶4} After Roger's death in 2014, Artie asked Jay to operate the farm and serve as president of the board of the company. Jay believed he was doing a good job running the farm. Artie initially believed Jay "stepped up to the plate" in taking on more responsibility at the farm, so she drafted a will in November of 2014 in which she left her 379 shares in the company to Jay. Beginning in 2016, Artie questioned Jay's fiscal responsibility in handling the farm and his ability to handle maintenance at the farm. Jay felt Artie was continually being uncooperative with him for no reason because he was

doing all the work on the farm. The relationship between Jay and Artie continued to deteriorate, and reached a turning point on June 21, 2020, when, at a Father's Day gathering, members of the family heard Jay refer to Artie as a "fucking bitch." Tensions escalated because Jay did not apologize to Artie for a year.

{¶5} On July 29, 2020, Artie made a new will, leaving her shares in the company to Rusty and Lisa because she felt Jay was not keeping up the farm and he was keeping money that belonged to the company. Artie did not inform Jay that she changed her will.

{¶6} A director's meeting of the company was held on April 22, 2021, at which Artie, as the majority shareholder, removed Jay as president of the board. Artie, as the majority shareholder, also elected Rusty and Lisa to the board. Jay quit as the farm manager in April of 2021 because "it was obvious [Artie] wasn't going to give him the shares."

{¶7} Jay, individually and in his capacity as the minority shareholder of Clark Brothers Farms, Inc. filed an amended complaint against Artie, individually and in her capacity as the majority shareholder, president, and member of the Board of Directors of Clark Brothers Farms, Inc.; James ("Rusty") Arnold, Jr., individually and in his capacity as a member of the Board of Directors of Clark Brothers Farms, Inc.; Lisa Arnold, individually and in her capacity as a member of the Board of Directors of Clark Brothers Farms, Inc., and Clark Brothers Farms, Inc.

{¶8} Jay set forth the following counts in his amended complaint: Count 1 – Breach of Contract (Specific Performance) against Artie; Count 2- Breach of Contract (Monetary Damages) against Artie; Count 3 – Promissory Estoppel (Specific Performance) against Artie; Count 4 – Promissory Estoppel (Monetary Damages) against

Artie; Count 5 – Fraud in the Inducement against Artie; Count 6 – seeking a declaratory judgment that all shares were transferred to Jay upon Artie's acknowledgment the farm was his; Count 7 – Wrongful Discharge in Violation of Public Policy against all defendants; Count 8 – Conversion against all defendants; Count 9 – Unjust Enrichment against Clark Brothers; Count 10 – Tortious Interference with Business Relationship and/or Employment Contract against all defendants; Count 11 – Breach of Fiduciary Duty against all defendants; Count 12 – Shareholder Oppression against all defendants; Count 13 – Civil Conspiracy against Artie, Lisa, and Rusty; and Count 14 – Derivative Action on Behalf of Clark Brothers against Artie, Rusty, and Lisa.

{¶9}　Artie, Lisa, and Rusty filed an answer to the amended complaint. Clark Brothers filed an answer and the following counterclaims against Jay: Officer Liability under R.C. 1701.641; Misuse and Conversion of Company Assets; Breach of Fiduciary Duty; Unjust Enrichment; Tortious Interference; Negligence; and Intentional Misconduct.

{¶10}　In June of 2023, Jay filed a motion for summary judgment on the company's counterclaims. Appellees filed a motion for partial summary judgment on Jay's claims against them. The parties filed responses and replies.

{¶11}　The trial court issued a judgment entry on January 3, 2024. The trial court denied Jay's motion for summary judgment on the company's counterclaims. The trial court granted appellees' motion on the breach of contract claims, finding the alleged oral agreement was insufficient to form a contract.

{¶12}　Because Jay's declaratory judgment claim that he was entitled to Artie's shares was based upon the alleged oral contract between the parties, the trial court also granted appellees' motion for summary judgment on Jay's declaratory judgment claim.

Similarly, because Jay's conversion claim was based upon Artie's alleged failure to register her shares in his name, the trial court granted appellees' motion for summary judgment on Jay's conversion claim because appellees could not have converted something Jay had no right to.

{¶13} The trial court granted appellees' motion for summary judgment on Jay's promissory estoppel claims, finding Artie did not make a clear and definite promise upon which Jay could reasonably rely. Next, the court granted summary judgment to appellees on Jay's fraud in the inducement claim because altering a will is not fraud. As to Jay's tortious interference with business relations claim, the trial court found appellees were entitled to summary judgment because appellees "had the privilege" to remove Jay from the board of the company. The trial court granted appellees' motion regarding the breach of fiduciary claims and shareholder oppressions claims based upon appellees' failure to register Artie's shares in Jay's name, as well as the civil conspiracy claims alleging appellees conspired to wrongfully discharge Jay in violation of public policy and conspired to defraud Jay and bring about a breach of contract between Jay and Artie.

{¶14} The trial court granted appellees' motion for summary judgment on the derivative claim on behalf of the company, finding Jay did not adequately represent the interests of the other shareholders as required by Civil Rule 23.1

{¶15} The trial court denied appellees' motion for summary judgment on the following claims: Jay's unjust enrichment claim against the company; Jay's breach of fiduciary duty claim based upon inflation of salaries, removal from the board, and threats of litigation; Jay's shareholder oppression claims (breach of fiduciary duty by majority

shareholder) for inflating salaries, removing Jay from the board, and threats of litigation; and Jay's civil conspiracy claim.

{¶16} A jury trial was held from March 5, 2024, to March 11, 2024.

{¶17} Rebekah Smith is a public accountant and testified as an expert on Jay's behalf. She opined the farm was profitable when Jay ran it. She testified as to what Jay, Artie, and Rusty were paid in salaries throughout the years.

{¶18} Walter Rogers, the accountant for Clark Brothers for twenty-five years, testified he believed that when Jay ran the farm and was president of the company, Jay misused company funds. Specifically, Rogers stated Jay did not give the money collected for rent from a rental house located on the farm to the company and Jay used equipment for personal jobs. Rogers did not know if Jay used the rent funds he collected for personal or company use, but stated Jay refused to keep records of how the cash was spent, which was not appropriate in a corporation. Rogers criticized Rebekah Smith's report, stating her conclusions were based on gross income and this is not the correct method by which to assess the profitability of the farm because the size of the farm is different now than when Jay ran it. Utilizing a "per acre" analysis, Rogers testified the farm revenue from when Jay was president (2014 to 2021) was $489 per acre and farm revenue after Jay quit (2021 to 2023) was $1,070 per acre.

{¶19} Artie stated that Roger set Jay's salary prior to 2014. When she was majority shareholder, as profits allowed, she increased his salary each year and gave him bonuses. Artie believed the cash salary was not Jay's only compensation because, during that time: Jay lived in the house on the farm for free, the company paid for the registration for one of his vehicles, the company paid for Jay and his wife's cell phones,

the company paid for the taxes and insurance on the house, and Jay received a load of corn and soybeans each year valued at approximately $2,500.

{¶20} Artie testified to the issues surrounding the farm when Jay was in charge from her perspective, including his failing to do maintenance on buildings, doing side jobs while neglecting maintenance on the farm, and collecting funds for the company and not turning them over to the company. Artie believed Jay did a good job of planting and harvesting, but did not do the other things necessary to run a business. Artie did not fire Jay from 2016-2021 despite the issues because "he was family" and he "loved to plant."

{¶21} Artie worked as the bookkeeper for the farm for many years, even prior to Roger's death. She never took a salary until 2020. She took a salary at that point because she took on more responsibility after Jay left the farm and because "she did the books for the company since 1992 and [had] never been paid for it."

{¶22} Rusty Arnold testified he helped Jay work on the farm throughout the years in the evenings and weekends after his full-time job. He did not receive a salary until 2020, when he became the farm manager. Rusty is making more money than Jay was to farm less acres but believes this is reasonable because he did not receive the other compensation that Jay did. Rusty believes that, during Jay's tenure as president of the company, Jay was not turning money into the company and was not transparent. Rusty also noted the communication difficulties between Jay and Artie and detailed his efforts to get the two parties to communicate with each other.

{¶23} Jay testified he has lived in the house on the farm for the majority of his life, and never paid rent, taxes, or insurance. When Roger died, Artie was not ready to give her shares to him and Jay believed, to get the shares, he had to keep up everyday

operation of the farm.  Jay never asked Artie for a higher salary and, when he asked Artie to fix the farmhouse, she refused.  Jay stated the company did pay for his and his wife's cellphones, but that everyone (Artie, Jay, Lisa, Rusty) took corn and soybeans each year, and beef whenever they wanted it.

{¶24}  When Jay ran the farm, he did the farm work and Artie paid the bills.  Jay stated he always communicated with Artie and she never told him he couldn't use company equipment to do side jobs.  He believes that was not an issue because his father and Rusty both used company equipment for side jobs.  Jay felt he kept up maintenance appropriately on the farm and kept the farm profitable.  Jay testified the cash he collected as rent for the other house on the farm was used to pay vendors for items used on the farm.  When he collected the rent, he did not turn over the receipts or give the cash to Artie and had no documentation as to where the money went; however, this was normal in the farm business because farm vendors deal primarily in cash.

{¶25}  Joel White worked at the farm from 1996 to 2010.  He testified Jay is in "bad mental shape" after "losing the farm."  Beverly Gorley, Jay's mother, testified Jay is "depressed after losing the farm."  Al Davis testified Jay is "very depressed" after losing the farm and believed Jay was "close to suicide" after losing the farm.  Jay Leymon stated Jay has "changed a lot" since "losing the farm."  Dalton Stepp stated losing the farm has "taken a toll" on Jay because he is "not being on his own farm doing the work that he loved to do."  Austin Wogan testified the loss of the farm affected Jay because Jay now cannot walk well.  Dawn Clark, Jay's wife, testified that since Jay is "no longer at the farm," Jay lost his laughter and is depressed.  Dawn described how Jay felt like his

purpose in life was to be a farmer and that has been taken from him, and how he longs to go to the farm on his favorite tractor.

{¶26} Ron Guyer testified that, in 2020, Artie told him the farm was doing well and Jay was doing well. Further, that in October of 2020, Artie told him the farm would go to Jay someday. Al Davis stated he offered to fix up the farmhouse, but Artie refused. Jay Laymon testified that Rusty would use farm equipment for side jobs.

{¶27} The jury found in favor of Jay on appellees' counterclaims. The jury found in favor of appellees on Jay's claims of civil conspiracy, Jay's breach of fiduciary duty claims against Lisa and Rusty, Jay's claim for unjust enrichment, and Jay's claims for breach of director's fiduciary duty. The jury found in favor of Jay on his breach of fiduciary duty claim against Artie as the majority shareholder. The jury awarded Jay $82,000 in damages. In the second portion of the bifurcated trial, the jury declined to award Jay punitive damages. The trial court issued a judgment entry memorializing the jury's verdict on March 12, 2024.

{¶28} On March 29, 2024, Jay filed a motion for prejudgment interest in the amount of $14,180.39. Jay filed a motion for statutory indemnification of attorneys' fees and costs from the corporation on April 9, 2024. Jay asked the trial court to order the company to pay his attorney fees in the amount of $557,460.48 in fees and $47,219.59 in costs.

{¶29} The trial court issued a judgment entry on June 13, 2024, denying Jay's motion for prejudgment interest and denying Jay's motion for statutory indemnification of attorneys' fees and costs. The trial court found Jay did not meet the statutory criteria contained in R.C. 1701.13(E)(3) because Jay did not "actually incur" the legal fees, as

Brent Dewey paid all of Jay's attorney fees without any obligation or expectation for Jay to reimburse him.

{¶30} Jay appeals the judgment entries of the Licking County Court of Common Pleas and assigns the following as error:

{¶31} "I. THE TRIAL COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT DISMISSING MR. CLARK'S ("JAY") BREACH OF CONTRACT CLAIMS.

{¶32} II. THE TRIAL COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT DISMISSING JAY'S PROMISSORY ESTOPPEL CLAIMS.

{¶33} III. THE TRIAL COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT DISMISSING JAY'S TORTIOUS INTERFERENCE CLAIM.

{¶34} IV. THE TRIAL COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT DISMISSING JAY'S SHAREHOLDER DERIVATIVE CLAIM.

{¶35} V. THE TRIAL COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT DISMISSING JAY'S REQUEST FOR DECLARATORY JUDGMENT AND CONVERSION CLAIM.

{¶36} VI. THE TRIAL COURT ERRED DURING TRIAL WHEN IT REFUSED TO PERMIT JAY TO PURSUE A CONSTRUCTIVE TRUST AS A REMEDY FOR HIS UNJUST ENRICHMENT CLAIM.

{¶37} VII. THE TRIAL COURT ERRED DURING TRIAL WHEN IT EXCLUDED STATEMENTS OF CLARK BROTHERS' FORMER OFFICERS.

{¶38} VIII. THE TRIAL COURT ERRED DURING TRIAL WHEN IT REFUSED TO INSTRUCT THE JURY ON NONECONOMIC DAMAGES – SPECIFICALLY FOR EMOTIONAL AND MENTAL HARM – TO REMEDY JAY'S TORT CLAIMS.

{¶39} IX. THE TRIAL COURT ERRED DURING TRIAL WHEN IT EXCLUDED A FACT WITNESS ON THE EVE OF TRIAL WITHOUT ANY LEGAL JUSTIFICATION.

{¶40} X. THE TRIAL COURT ERRED IN DENYING JAY'S POST-TRIAL REQUEST FOR STATUTORY INDEMNIFICATION OF FEES AND COSTS INCURRED IN THIS MATTER."

{¶41} Clark Brothers, Artie, Rusty, and Lisa also appealed the trial court's judgment entry and assigned the following as error:

{¶42} "I. WAS THE VERDICT OF $82,000 IN COMPENSATORY DAMAGES IN FAVOR OF PLAINTIFF/APPELLANT JAY CLARK AND BASED ON CLAIMS OF FIDUCIARY DUTY AND THEREFORE THE MARCH 12, 2024, JUDGMENT ENTRY, AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE?

I.

*Summary Judgment Standard*

{¶43} Civil Rule 56 states, in pertinent part:

Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party

against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

{¶44} A trial court should not enter summary judgment if it appears a material fact is genuinely disputed, nor if, construing the allegations most favorably towards the non-moving party, reasonable minds could draw different conclusions from the undisputed facts. *Hounshell v. Am. States Ins. Co.*, 67 Ohio St.2d 427 (1981). The court may not resolve any ambiguities in the evidence presented. *Inland Refuse Transfer Co. v. Browning-Ferris Inds. Of Ohio, Inc.*, 15 Ohio St.3d 321 (1984). A fact is material if it affects the outcome of the case under the applicable substantive law. *Russell v. Interim Personnel, Inc.*, 135 Ohio App.3d 301 (6th Dist. 1999).

{¶45} When reviewing a trial court's decision to grant summary judgment, an appellate court applies the same standard used by the trial court. *Smiddy v. The Wedding Party, Inc.*, 30 Ohio St.3d 35 (1987). This means we review the matter de novo. *Doe v. Shaffer*, 2000-Ohio-186.

{¶46} Jay argues that the alleged oral contract is not barred by R.C. 2107.04 because his claims are not based upon Artie's changing of her will. However, the details contained in his complaint contradict this argument. In paragraph nineteen of his complaint, Jay states, "in exchange for operating Clark Brothers, Defendant Clark promised [Jay] that, upon her death, he would receive [Artie's] shares in Clark Brothers if [Jay] would take care of the farm." Jay further states in his complaint that Artie "changed

her will such that [Jay] would receive all of her shares of Clark Brothers and would therefore become the sole owner of the corporation; Artie "shared a copy of her will with [Jay] in 2014," Artie "knew of the promises in the paragraphs above," and "in July of 2020, [Artie] changed her 2014 will such that her shares in Clark Brothers would pass to James Arnold and Lisa Arnold." As to Count 1, Jay specifically states Artie "breached their agreement in July 2020 when she changed her will." In Count 2, Jay asserts Artie "breached their agreement in July 2020 when she changed her will." This same language is contained in Counts 3 and 4 for promissory estoppel.

{¶47} Based upon the specific language used in the complaint, it is clear these claims are based, at least in part, upon Artie's changing of her will. R.C. 2107.04 provides, "no agreement to make a will or make a devise or bequest by will shall be enforceable unless it is in writing." It is undisputed that there is no written agreement in this case. Accordingly, any facts or claims based upon Jay's assertion that Artie "promised he would receive her shares upon her death" are clearly barred by R.C. 2107.04.

{¶48} In Counts 1 through 4, Jay also alleges Artie breached their agreement when she "changed her mind and would not give ownership of Clark Brothers" to Jay. Jay bases this portion of his claims on an alleged oral contract made between him and Artie, and based upon the following exchange at Artie's deposition:

Q: Did you ever tell [Jay] in 2014, I'm giving you the shares and I – but you need to shape up or you need to do a good job?

A: Yes. We talked about that when he took over, when his dad passed away. You need to do the same things, you need to keep this farm up just

like your grandfather and father did.  Do you agree to that?  And he said yes, he would take care of it just like his father and grandfather did."

**{¶49}**  Jay contends the trial court committed error in granting summary judgment on his breach of contract claims because the contract terms were sufficiently definite, and that any ambiguity should have been resolved by the jury, not the trial court on summary judgment.

**{¶50}**  Jay first argues the trial court based its decision solely on the lack of an offer.  We disagree with Jay's characterization of the trial court's determination.  While the trial court did state once in its judgment entry that there was "no legal offer," the court spent most of its analysis as to the breach of contract claims on whether the contract terms were definite and certain, specifically the contract price and contract duration.

**{¶51}**  Elements of a breach of contract claim include an offer, acceptance, contractual capacity, consideration, a manifestation of mutual assent, and legality of object and of consideration.  *Untied v. J.J. Detweiler Enterprises, Inc.*, 2009-Ohio-3976 (5th Dist.).  In order for a party to be bound to a contract, the party must consent to its terms, the contract must be certain and definite, and there must be a meeting of the minds of both parties.  *Id.; Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations*, 61 Ohio St.3d 366 (1991); *Justice v. Justice*, 2000 WL 221996 (5th Dist.).  Vagueness of expression, indefiniteness, and uncertainty as to any of the essential terms of an agreement have often been held to prevent the creation of an enforceable contract.  *Jones v. City of Warren*, 2003-Ohio-2236 (11th Dist.); *Rulli v. Fan Co.,* 79 Ohio St.3d 376 (1997).

**{¶52}**  A contract price must be definite and certain.  *Justice v. Justice*, 2000 WL 221996 (5th Dist.).  Jay contends though the price is not specifically stated, the price is

ascertainable from the words and actions of the parties.  While this Court has held that a price term is not indefinite when it is "easily ascertainable by reference to some extrinsic standard," we have also held that if "price terms are so vague and indefinite that one party may charge what he will while the other party must guess at his obligation, the contract is illusory and unenforceable." *Id.* The phrase "keep this farm up just like your grandfather and father did" is not reasonably certain, nor is it easily ascertainable from the words and the actions of the parties.  There is no "meeting of the minds" between the parties, as Artie and Jay each have a different definition of what "just like your father and grandfather" means.  Thus, the purchase price was never agreed upon.

**{¶53}** This Court has previously found no contract existed due to uncertainty in its terms when the oral promise contained the term "when appellant's financial situation sufficiently improved," and no contract existed where a written contract contained a variable interest rate and no closing date for the completion of the transaction. *Justice v. Justice*, 2000 WL 221996 (5th Dist.);  *Durbin v. R.A. Griffin Co.,* 2000 WL 873768 (5th Dist.); see also *JLP-Orange, LLC v. Tuller Square Northpointe,* LLC, 2024-Ohio-2236 (5th Dist.) (contract illusory when letter said roadway would be open once conditions completed to plaintiff's "sole satisfaction."); *Untied v. J.J. Detweiler Enterprises, Inc.*, 2009-Ohio-3976 (5th Dist.) (alleged contract lacks sufficient information to constitute contract because it does not say who will provide free gas or for long it will be provided).

**{¶54}** We similarly find no contract exists in this case due to uncertainty in its terms, no meeting of the minds, and indefiniteness.  We find the cases cited by Jay in which he argues indefiniteness may be given precision by the actions or dealings of the parties to be distinguishable from the instant case, as they involve a contract for the sale

of commercial goods between parties who had been long-standing partners and where the price is "fixed in terms of some agreed market or other standard." *Oglebay Norton Co. v. Armco, Inc.*, 52 Ohio St.3d 232 (1990); *Preston v. First Bank of Marietta*, 16 Ohio App.3d 4 (4th Dist. 1983).

{¶55} This case does not involve the contract for a sale of goods, nor is there some "agreed market" or "other standard" by which to define the price. As noted by the trial court, the obligation may entail maintaining the farm in substantially the same physical condition it was in when his father and grandfather took care of the farm, it might require Jay to keep the farm profitable apart from maintenance and upkeep issues, it may require Jay to increase profits as his father and grandfather did, and it may or may not require Jay to maintain the various structures on the farm.

{¶56} Additionally, the alleged oral contract does not contain any indication how long Jay had to work to be entitled to her shares and/or when Artie was allegedly supposed to turn her shares over to Jay. Jay was unable to clearly articulate at his deposition the length of the contract and/or when Artie was supposed to give him the shares. Jay testified at one point in his deposition that it was "his understanding" Artie was going to transfer the shares of the farm to him shortly after Roger passed away. At a separate point in the deposition, Jay stated Artie was supposed to give him the shares "now." He then stated her oral promise was that she would transfer them when "she was ready."

{¶57} Jay contends that absent an express duration, a "reasonable time" is implied. However, the record is devoid of any evidence, either by some objective and extrinsic standard or by the parties' previous dealings, how long would constitute a

"reasonable" time. The only evidence in the record as to how long Jay's father and/or grandfather ran the farm in "their way" was that Jay's grandfather ran the farm for over thirty years, as did Jay's father.

**{¶58}** We again find the cases cited by Jay to be distinguishable from the instant case, as they involve a general contractor making an unconditional promise to pay a subcontractor "within a reasonable time" and a case involving the construction of a garage in which the contract did not contain a completion date but contained an approximate delivery date. *Transtar Electric, Inc. v. A.E.M. Electric Services Corp.*, 2014-Ohio-3095; *Morton Buildings, Inc. v. Correct Custom Drywall, Inc.*, 2007-Ohio-2788. This case does not involve a general contractor or a construction contract with an approximate delivery date. Additionally, though Jay argues the Clark Brothers counterclaims "define" how Jay was supposed to take care of the farm such that it made the alleged contract sufficiently definite, we find the substance of the counterclaims only serves to show how differently the parties viewed the obligations of keeping the farm "like [Jay's] father and grandfather."

**{¶59}** The parties clearly have not "agreed about issues critical to the transaction." *Mr. Mark Corp. v. Rush, Inc.*, 11 Ohio App.3d 167 (8th Dist. 1993). Unlike in the cases cited by Jay, the uncertainty contained in the alleged oral argument was not about minor items that would be more likely to be left to the option of one of the parties or determined by what is customary and reasonable. *Id.* (document covers the essential terms of the transaction such as total price, down payment, interest rate, time for payment, method for escrow, but left out minor term); *Kostelnik v. Helper*, 2002-Ohio-2985 (settlement agreement sufficient to form a contract because all parties agreed on the price and time for payment). Rather, the uncertainty surrounds important and key items such as price

and duration. "The more important the uncertainty, the stronger the indication is that the parties do not intend to be bound." *Id.,* citing the Restatement of Contracts.

{¶60} Construing the evidence most strongly in favor of Jay, we find the alleged oral contract fails. Jay failed to show an agreed-upon purchase price, the duration of the contract, when the shares were supposed to be transferred, and other reasonably certain terms of the alleged contract. The alleged contract in this case lacks sufficient information to constitute a contract. No genuine issue of material fact exists as to the existence of a contract when the terms of the contract are not definite and certain.

{¶61} Finally, Jay contends the trial court resolved purportedly ambiguous contract terms that should have been resolved by the jury. We agree that generally it is the role of the factfinder to resolve ambiguity in a contract. However, whether a contract is ambiguous and whether it is sufficiently definite are two separate concepts that require separate and distinct considerations. The existence of a contract is question of law. *JLP-Orange, LLC v. Tuller Square Northpoint,* LLC, 2024-Ohio-2236 (5th Dist.). Further, if an agreement is vague and indefinite as to an essential term, "there is no contract and one cannot be created through the use of parol evidence." *Untied v. J.J. Detweiler Enterprises, Inc.*, 2009-Ohio-3976 (5th Dist.). Additionally, if the evidence is so clear and one-sided that no reasonable person would determine the disputed issue in any way but one, the court is within its authority to decide the question as a matter of law. *Alexander v. Buckeye Pipeline Co.*, 53 Ohio St.2d 241 (1978). We find the trial court completed an appropriate analysis pursuant to Civil Rule 56.

{¶62} Based on the foregoing, Jay's first assignment of error is overruled.

II.

**{¶63}** In his second assignment of error, Jay argues the trial court committed error in granting summary judgment to appellees on his promissory estoppel claims.

**{¶64}** Jay first contends the trial court conducted a breach of contract analysis for this claim rather than a promissory estoppel analysis and improperly required him to prove "extraneous requirements" that Jay was not required to prove. We disagree. The trial court listed the correct statements of law with regards to promissory estoppel in its judgment entry. Additionally, the trial court specifically analyzed the promissory estoppel claims separately from the breach of contract claims.

**{¶65}** Finally, Jay argues reasonable jurors could find Artie made a clear and unambiguous promise that would induce reliance when she stated, "take care of the farm like your father and grandfather and [Jay] would receive her shares."

**{¶66}** Promissory estoppel is an equitable doctrine for preventing the harm resulting from reasonable reliance upon false representations. *Swank v. Swank*, 2011-Ohio-6920 (5th Dist.). The party asserting promissory estoppel bears the burden of proving, by clear and convincing evidence, the following elements: (1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) which is reasonable and foreseeable; and (4) injury by the reliance. *Id.*

**{¶67}** We agree with the trial court that there is no genuine issue of material fact as to the promissory estoppel claim because Jay does not demonstrate a promise, clear and unambiguous in its terms. It is not clear as to what Jay had to do to become entitled to the company because the phrase "keep this farm up just like your grandfather and father did" is vague such that the "price" or what Jay was expected to do in order to get

the shares was vague. Jay's own testimony demonstrates the lack of a clear and unambiguous promise, as in his deposition, he could not clearly identify when Artie was supposed to transfer the shares to him (at one point, he stated in his deposition that she was supposed to transfer them in 2014, but then stated her oral promise was that she would transfer them when "she was ready.") The fact that multiple witnesses allegedly heard Roger and/or Lawrence (Jay's grandfather) say Jay would receive the farm someday is not relevant to the promissory estoppel claim, as the promise at issue in this case is not any promise by Roger or Lawrence, but solely the promise allegedly made by Artie.

{¶68} We find there is no genuine issue of material fact as to promissory estoppel because there was no clear and unambiguous promise. At best, Artie made vague comments. Accordingly, the trial court did not commit error in granting summary judgment to appellees on Jay's promissory estoppel claims. Jay's second assignment of error is overruled.

III.

{¶69} In his third assignment of error, Jay contends the trial court committed error in granting summary judgment to Lisa and Rusty on Jay's tortious interference with business relationship or contract claim. Jay argues the trial court dismissed the claims on law "irrelevant to his claim." We disagree.

{¶70} Interference with a business relationship or contract occurs when a person, without privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relationship with another, or not to perform a contract with another. *A&B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades*

*Council*, 73 Ohio St.3d 1 (1995).  The elements of tortious interference with a business relationship are: (1) the existence of a prospective business relationship; (2) the wrongdoer's knowledge thereof; (3) intentional interference causing a breach or termination of the relationship and (4) damages resulting therefrom.

{¶71}  With regard to tortious interference, Jay alleged in his complaint that Lisa and Rusty "expressed their desire and support" to remove Jay from his employment with the company and "took affirmative actions to remove Jay from his employment and involvement" with the company.  The facts cited in support of this "affirmative action" in the complaint were that Lisa and Rusty voted to remove Jay from the Board of Directors of Clark Brothers, voted to remove Jay from his role as president of Clark Brothers, and "encouraged and supported" Artie's decision to change her will and/or not fulfill her alleged oral contract with Jay to give him her shares.  As detailed above, we found the trial court did commit error in finding there was no contract between Artie and Jay as to her shares, and in finding that any alleged promise regarding what Artie did with the shares in her will had to be in writing.  Accordingly, based on these determinations, we find the trial court did not commit error in dismissing the tortious interference with business relations claim based upon "encouragement and support" Lisa and/or Rusty allegedly gave Artie in changing her will and/or not fulfilling her alleged promise to give Jay her shares.

{¶72}  Therefore, the only facts remaining for Jay to base his tortious interference claims on are Lisa and Rusty's alleged actions to "remove Jay from his employment and involvement with the company."  There is no dispute that Artie asked Jay to remain as farm manager, but he refused and quit after he was removed as president and director of

the board.  Thus, the only "employment and involvement" with the company that Rusty and/or Lisa could have interfered with was the removal of Jay as president and/or as a director.  R.C. 1701.57(A) provides that "unless the articles, the regulations adopted by the shareholders, or the regulations adopted by the directors * * * provide for a different term (which may not exceed three years from the date of election and until a successor is elected), each director shall hold office until the next annual meeting of the shareholders * * * or until the director's removal from office."  Jay did not provide any articles or regulations in his summary judgment briefing providing for a specific term of office for directors.  There is no dispute that Jay had been a director since 2014, which was seven years before his removal in 2021.  Thus, Jay was in holdover status until his successor was chosen.  *Jovenall v. Zerco Systems Int'l Inc.*, 2004-Ohio-3932 (11th Dist.).  Because the tort of interference with business relationships occurs when a person "without privilege to do so" purposely causes a third person not to continue a business relationship, the trial court properly granted summary judgment because R.C. 1701.57(A) specifically provided Lisa and Rusty with the "privilege" to remove Jay as the president and director of the Board.

**{¶73}** Further, at his deposition, Jay testified "Rusty Arnold didn't do anything wrong" and "Lisa Arnold did nothing wrong."  We find the trial court did not commit error in finding there was no genuine issue of material fact as to Jay's tortious interference claims against Rusty and Lisa.  Jay's third assignment of error is overruled.

IV.

**{¶74}** In Jay's fourth assignment of error, he asserts the trial court committed error in dismissing his shareholder derivative claim.  Jay contends the trial court wrongly issued

a "categorical rule" that derivative actions cannot apply to corporations with two shareholders and the trial court failed to make a specific determination based upon the relevant factors.

{¶75} We disagree with Jay's characterization of the trial court's decision as containing a "categorial rule" that derivative actions cannot apply to corporations with two shareholders. Rather, the trial court specifically listed in its judgment entry eight factors that serve as "appropriate guideposts" for an analysis as to whether a plaintiff fairly and adequately represents the interests of similarly situated shareholders. The trial court further examined each one of the factors, completed an analysis, and found Jay did not fairly and adequately represent the interests of other shareholders.

{¶76} Civil Rule 23.1 provides, "the derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders similarly situated in accordance with the right of the corporation." This Court has held there is no bright-line test to be applied in determining whether a plaintiff in a derivative suit fairly and adequately represents the interests of similarly situated shareholders, and such a determination is made on a case-by-case basis, particularly where a close corporation is involved. *Goulder v. Luntz*, 2005-Ohio-87 (5th Dist.); *HER, Inc. v. Parenteau*, 2002-Ohio-577 (10th Dist.). However, factors to consider in evaluating whether the requirements under Civil Rule 23.1 are met include: (1) economic antagonisms between the representative and the class; (2) the remedy sought by plaintiff in the action; (3) indications that the named plaintiff was not the driving force behind the litigation; (4) plaintiff's unfamiliarity with the litigation; (5) other litigation pending between plaintiff and defendants; (6) relative magnitude of plaintiff's personal interests as

compared to his interest in the derivative action itself; (7) plaintiff's vindictiveness towards the defendant; and (8) the degree of support plaintiff was receiving from the shareholders he purports to represent. *Id.* While there may be some factual situations in which it is proper for there to be a "legitimate class of one" in a derivative lawsuit, this depends upon the facts and circumstances contained in each case. *Cohen v. Cleveland Commerce Center, Inc.*, 2009 WL 1767588 (N.D. Ohio 2009); *Razavi v. Vasila*, 2022-Ohio-463 (5th Dist.).

{¶77} We find the trial court did not commit error in finding Jay does not fairly and adequately represent the interests of the shareholders similarly situated in enforcing the rights of the corporation. There are no economic antagonisms between Jay and the other shareholders in the class because there are no other shareholders in the class. The remedy sought by Jay is specific to him as opposed to money being paid back to the corporation, i.e., the removal and reallocation of Artie's entire interest in the company, which would leave Jay as the sole shareholder. There are indications that Jay is not the driving force behind the litigation because Dewey is paying all of Jay's legal bills. Dewey testified at his deposition that he "told [Jay] that you're going to have to fight this thing," and he told Jay "I'll back you financially." At his deposition, Jay stated that he and Dewey "decided together" to sue for the shares, and Dewey said to Jay, "let's get a lawyer" and told Jay "if he sued Artie he [Dewey] would pay all the legal bills." It is not clear whether Jay was familiar with the litigation, as he stated at his deposition that he did not know why he was suing Lisa or Rusty, and that he did not read the amended complaint. The balance of Jay's amended complaint and appellees' counterclaims is litigation between Jay, Artie, Rusty, Lisa, and the company. The magnitude of Jay's personal interests is higher than

his interest in the derivative claim itself because Jay is the plaintiff in multiple other claims. Jay's motives in the derivative claim are personal because he asserts that his family business and family legacy were "stolen" from him. While Jay would not classify his behavior prior to or during the case as "vindictive," it is clear from the record that there is great tension and antagonism between the parties.  Finally, Jay did not receive any support from the shareholders he purports to represent because he represents only himself.

{¶78}  Based upon the consideration of the above-listed factors, we agree with the trial court's analysis that Jay does not meet the requirements contained in Civil Rule 23.1 required for a derivative claim.

{¶79}  We further note that Jay's inability to maintain a derivative claim does not leave him without a remedy.  As evidenced by the extensive trial in this case, Jay pursued and was awarded damages for breach of fiduciary duty by Artie as the majority shareholder.  Jay's fourth assignment of error is overruled.

V.

{¶80}  In his fifth assignment of error, Jay argues the trial court committed error when it granted summary judgment in favor of appellees and against Jay on his request for declaratory judgment and conversion claims.

{¶81}  In his declaratory judgment claim, Jay sought an order that Artie's shares were transferred to him and Clark Brothers must register the transfer of her shares to Jay under R.C. 1308.27.  As evidenced by his complaint, Jay's justification for entitlement to Artie's shares is the alleged oral contract between he and Artie.  In Assignment of Error I, we found the trial court did not commit error in finding there was no oral contract

between Artie and Jay. Because the alleged oral contract was the basis for Jay's declaratory judgment claim, the trial court did not commit error in granting summary judgment to appellees on this claim.

{¶82} In his conversion claim, Jay contends Artie's failure to register her shares in Jay's name wrongfully interfered with and converted Jay's property rights. The elements for a conversion claim are: (1) plaintiff's ownership or right to possession of the property at the time of conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages. *Joyce v. Gen. Motors Corp.*, 49 Ohio St.3d 93 (1990). In Assignment of Error I, we affirmed the trial court's determination that no contract existed in this case. Accordingly, no relationship existed which legally obligated Artie to deliver her shares to Jay.

{¶83} Jay's fifth assignment of error is overruled.

VI.

{¶84} In Jay's sixth assignment of error, he argues the trial court committed error during trial when it refused to permit him to pursue a constructive trust as a remedy for his unjust enrichment claim. In his "amended trial brief" filed on February 27, 2024, under the "itemized list of special damages," Jay stated he sought, as damages for his unjust enrichment claim, "a constructive trust for Ms. Clark's three-hundred and seventy-nine (379) Clark Bros. shares."

{¶85} In his appellate brief, Jay contends the trial court "conflated distinct legal doctrines" and "refused to consider evidence justifying a constructive trust" because the trial court wrongfully believed it dealt with the constructive trust issue on summary judgment. We disagree with Jay's characterization of the trial court's ruling. The trial

court could not have dealt with the issue of a constructive trust remedy on summary judgment because Jay did not request a constructive trust remedy in his original complaint, in his amended complaint, his original trial brief, or any other pleading prior to his "amended trial brief" that was filed in February of 2024.

{¶86} The trial court stated on the record that, in essence, Jay's request for a constructive trust remedy was an attempt, post-summary judgment, to relitigate the issue the trial court had already determined on summary judgment, i.e., that Jay was not entitled to Artie's shares due to her alleged oral promise to him in 2014. We agree with the trial court. As noted above, Jay never requested a constructive trust remedy in his original complaint, his amended complaint, his original trial brief, or in any other manner prior to his "amended" trial brief, filed after the trial court issued its summary judgment entry. Subsequent to the ruling on the motions for summary judgment, Jay sought an additional remedy for his unjust enrichment claim in the form of an equitable trust on the shares held by Artie due to her alleged oral promise to him in 2014.

{¶87} Jay's unjust enrichment claim is against the company, not Artie individually. As evidenced by the record at trial, including pleadings such as the complaint and Jay's own proposed jury instructions, Jay's argument was that, because Artie allegedly told Jay he would be given the shares if he remained on the farm and worked for a below-market rate, it would be unjust to permit the company to retain the benefit without paying for it; thus, Jay would be entitled to recover the "reasonable value of the services he performed and work he provided for the benefit of Clark Brothers." Therefore, the damages for the unjust enrichment claim against the company would not be a trust imposed upon the

shares themselves, but would be the reasonable value of the work Jay performed for the company from 2014 to 2021, for which he was not otherwise compensated.

{¶88} Further, Jay contends the trial court did not "properly analyze any facts necessary to prove a constructive trust." However, the trial court would not need to analyze the facts with regard to a constructive trust because the jury found against Jay on his unjust enrichment claim. The interrogatory with regards to the unjust enrichment claim states, "did [Jay] prove, by a preponderance of the evidence, that he did not receive payment or other compensation and benefits of reasonable value for the services he rendered to the company from 2014-2021?" The jury answered, "no." Because Jay sought a constructive trust as a remedy for his unjust enrichment claim, there was no reason for the trial court to determine whether a constructive trust was an appropriate remedy because the jury found in favor of the company on the unjust enrichment claim.

{¶89} Finally, in his brief, Jay states the "uncontroverted facts justified a constructive trust instruction as to Ms. Clark's shares" and "the trial court erred in rejecting the instruction." However, a constructive trust is an "equitable remedy that protects against unjust enrichment." *Estate of Cowling v. Estate of Cowling*, 2006-Ohio-2418. The Ohio Supreme Court has long held that a right to a jury trial does not exist if the relief sought is equitable relief. *Cross v. Ledford*, 161 Ohio St. 469 (1954). Rather, the matter of the imposition of a constructive trust is a matter of law for the trial court to determine. *Estate of Cowling v. Estate of Cowling*, 2006-Ohio-2418. Because a right to a jury trial does not exist on a constructive trust claim, the trial court did not commit error in failing to give a constructive trust jury instruction.

{¶90} We find the trial court did not commit error with regards to the constructive trust issue. However, even if we were to find the trial court committed error in this regard, we find any error to be harmless. Civil Rule 61 provides that "no error or defect in any ruling or in anything done or omitted by the court * * * is grounds for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice." We must "disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." *Id.* In analyzing whether a substantial right has been affected, a reviewing court must determine whether the trier of fact would have reached the same decision, had the error not occurred. *Ogle v. Tr. Of Ogle Irrevocable Tr.*, 2024-Ohio-2280 (5th Dist.). The jury found against Jay on his unjust enrichment claim. Jay sought a constructive trust as a remedy for his unjust enrichment claim. Because the remedy is an equitable one, the trial court, not the jury, decides whether to impose a constructive trust. Accordingly, we find the trier of fact would have reached the same decision had the error not occurred.

{¶91} Jay's sixth assignment of error is overruled.

VII.

{¶92} In his seventh assignment of error, Jay contends the trial court "misapplied the law" to exclude evidence of Clark Brothers' former officers. At trial, Jay sought to introduce the statements of both Roger and Lawrence that they wanted the farm to go to Jay. Jay argued this testimony was necessary to provide the jury with "context and facts underpinning the case," such as showing the history of Jay working at the farm and showing how Artie refused to give Jay shares promised to him by Lawerence and Roger.

The trial court excluded the testimony based on hearsay after appellees filed a motion in limine to exclude the evidence.

{¶93} Jay argues: (1) the testimony is not hearsay because it is not offered to prove the truth of the matter asserted and (2) the testimony is subject to the hearsay exception of a party-opponent pursuant to Evidence Rule 801(D)(2) because Roger and Lawrence were former directors of Clark Brothers.

{¶94} A trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence. *Huth v. Kus*, 2018-Ohio-1931 (5th Dist.). "Hearsay" is a statement, other than one made by declarant while testifying at the trial, offered in evidence to prove the truth of the matter asserted. Evidence Rule 801(C). Hearsay is generally not admissible unless it falls within one of the recognized exceptions. *State v. Steffen*, 31 Ohio St. 111 (1987). Ordinarily, we review a trial court's hearsay ruling for an abuse of discretion. However, whether evidence is admissible because it falls within an exception to the hearsay rule is a question of law; thus, our review is de novo. *MCM Builders, LLC v. Sheehan*, 2019-Ohio-3899 (5th Dist.).

{¶95} We find Jay's argument that the statements were not offered for the truth of the matter asserted to be unavailing. It is clear the statements were offered for the truth of the matter asserted, i.e., that Roger and/or Lawrence promised Jay the farm would "someday" be his.

{¶96} We likewise find Jay's argument with regards to the party-opponent exception to the hearsay rule to be not well-taken. A statement is not hearsay if "the statement is offered against a party and is * * * a statement by his agent or servant

concerning a matter within the scope of agency or employment, made during the existence of the relationship." Evidence Rule 801(D)(2). We find there is a question as to whether either Roger or Lawrence is truly a party-opponent because they were officers of the corporation over ten years ago, not current officers of the corporation when the corporation was being sued for acts taken by the company long after their death. However, even if they were "party-opponents," their statements to not qualify under the exception contained in Evidence Rule 801(D)(2) because there is no evidence in the record that any of the statements made by either Lawrence or Roger were "concerning a matter within the scope of the employment or agency." *Mowery v. Columbus*, 2006-Ohio-1153 (10th Dist.). Rather, the discussions cited to in the record involve Lawrence or Roger's personal intentions discussed with their friends or family members.

**{¶97}** Even if we were to find the trial court committed error in finding the statements to be hearsay or committed error in finding no hearsay exception applied, we find any error to be harmless because it did not affect the substantial rights of the parties.

**{¶98}** First, any error in the exclusion of this evidence is harmless because any evidence as to what Roger and/or Lawrence promised or thought would happen with the farm is irrelevant to Jay's claims, as his claims are all based upon alleged promises and actions taken by the company, Artie, Lisa, and Rusty, after Roger and Lawrence's deaths. Specific to the unjust enrichment claim, only the statements Artie made are relevant, not any statements made by Roger or Lawrence. Roger specifically left the shares to Artie in his will. Jay did not challenge the will. Thus, no unjust enrichment claim can lie with regard to any promises Roger allegedly made. Jay contends that Roger and Lawrence's statements demonstrate how Artie refused to give Jay shares promised to him by

Lawerence and Roger.  However, the issue in this case is not what either Lawerence or Roger allegedly promised Jay.  Roger and/or Lawrence's statements that Jay would "someday" own the farm are not relevant to Jay's claims in relation to what Artie promised him.

{¶99}  Second, Jay argues the "fifty years of farm history" was "essential to the case."  As to the farm history of Jay's working on the farm for years since he was a child with his father and grandfather, any testimony in this regard would be cumulative to the testimony provided by Jay himself, Jay Laymon, Joel White, Beverly Gorley, Ron Guyer, and Al Davis, all individuals who knew Roger and/or Lawrence, and described their work with Jay on the farm since Jay was a child.  These witnesses all provided testimony about the history of the farm, explained how Jay worked with his father and grandfather, and detailed how Jay's life revolved around the farm both during and after his father and grandfather's lives.  Because any testimony would have been cumulative, the exclusion of the testimony did not impact Jay's substantial rights and did not impact the outcome of the trial.  See *State v. Granderson*, 2008-Ohio-3757 (5th Dist.) (error harmless because cumulative testimony); *State v. Caldwell*, 2014-Ohio-4486 (testimony cumulative, so harmless error); *State v. Thoen*, 2024-Ohio-5720 (5th Dist.); *King v. CSX Transp., Inc.*, 2009-Ohio-1471 (6th Dist.); *In re S.L.*, 2016-Ohio-5000 (3rd Dist.).

{¶100} Finally, Jay contends these statements are relevant to prove a breach of contract, promissory estoppel, noneconomic damages, and constructive trust.  In the balance of the assignments of error, we find the trial court did not commit error in granting summary on the breach of contract claims, granting summary judgment on the promissory

estoppel claims, in not imposing a constructive trust, or not giving an instruction on noneconomic damages.

{¶101} Jay's seventh assignment of error is overruled.

VIII.

{¶102} In Jay's eighth assignment of error, he contends the trial court committed error when it refused to instruct the jury on noneconomic damages for emotional and mental harm.

{¶103} The giving of jury instructions is within the sound discretion of the trial court and will not be disturbed on appeal, absent an abuse of discretion. *Westfall v. Aultman Hosp*, 2017-Ohio-1250 (5th Dist.). In order to find an abuse of discretion, we must determine the trial court's decision was unreasonable, arbitrary, or unconscionable, and not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217 (1983). Whether the jury instructions correctly state the law is a question of law, which we review de novo. *Thomas v. Chimera*, 2023-Ohio-2132 (5th Dist.).

{¶104} The trial court declined to give the jury instruction based on noneconomic damages for two reasons: (1) because it viewed the crux of the action as a breach of contract action rather than a tort action and (2) because there was not sufficient evidence for the issue to go to the jury without being speculative.

{¶105} The only claim the jury found in favor of Jay on was the breach of fiduciary duty claim against Artie as the majority shareholder. Thus, we focus only on this claim in our analysis of the issue of noneconomic damages. We agree with Jay that the action in this case did not sound in contract because the trial court granted summary judgment to appellees on Jay's breach of contract and promissory estoppel claims. We similarly agree

with the Jay that expert testimony is not required for an instruction on noneconomic damages. *Williams v. Troy*, 2023-Ohio-1844 (5th Dist.).

{¶106} However, we concur with the trial court that there was not sufficient evidence for the issue of noneconomic damages to go to the jury without being speculative. In Ohio, a tort recovery may not be had for damages which are speculative. *Johnson v. Univ. Hosps. of Cleveland*, 44 Ohio St.3d 49 (1989). The breach of fiduciary claim against the majority shareholder (Artie) focused on her paying herself a salary, paying Rusty a salary, allegedly threatening Jay with litigation, and in removing him as the president of the board. The majority shareholder duty obligates majority shareholders not to use their power to promote their personal interests at the expense of corporate interests or the minority shareholders. *Tinter v. Lucik*, 2007-Ohio-4437 (8th Dist.). Neither the claim nor the remedy for the breach of fiduciary action against Artie as the majority shareholder involved the "loss of the farm" or the actions of Artie in failing to give Jay her shares. All of the testimony regarding Jay's mental and emotional state involved his mental and emotional state after "losing the farm" and not physically being able to be "on his own farm doing the work he loved to do." None of the testimony tied any of his depression or suicidal thoughts to Artie paying herself a salary, Artie paying Rusty a salary, the letter sent by appellees' attorney to Jay, or his removal as president of the board.

{¶107} We further find any error in the lack of noneconomic jury instruction was harmless error. As indicated by his response to appellees' cross-appeal, Jay agrees that the $82,000 the jury awarded to Jay represented the amount Artie gave herself in salary between the time she started paying herself to the time of trial, and was based specifically

on the "Cash Compensation Summary" presented by Jay. None of the emotional damages testimony offered by Jay was linked in any way to Artie paying herself a salary in the amount of $82,000. Thus, no substantial right of Jay's was affected because the trier of fact would have reached the same conclusion had the error not occurred. Jay's eighth assignment of error is overruled.

IX.

{¶108} In Jay's ninth assignment of error, Jay contends the trial court committed error in excluding Brent Dewey as a witness at trial because the trial court should have imposed a less-severe sanction for any discovery violation. Dewey is Jay's cousin, who owns land on two sides of the Clark Brothers' Farm.

{¶109} Appellees filed a motion in liminie to exclude the testimony of Dewey based upon the fact that Dewey was an expert and failed to submit an expert report and failed to answer questions at his deposition regarding his opinions. The trial court granted the motion, finding Dewey failed to answer questions at his deposition.

{¶110} The admission or exclusion of evidence lies within the sound discretion of the trial court. *State v. Sage*, 31 Ohio St.3d 173 (1987). An abuse of discretion is more than an error of law or judgment; it implies an unreasonable, arbitrary, or unconscionable attitude on the part of the trial court. *Blakemore v. Blakemore*, 5 Ohio St.3d 217 (1983). Further, the trial court has broad discretion to impose sanctions for violations of discovery rules, and this Court will not reverse sanctions absent an abuse of that discretion. *Masten v. Masten*, 2016-Ohio-5738 (5th Dist.). The existence of prejudice resulting from noncompliance with the discovery rules is of primary concern. *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83 (1985).

{¶111} During his deposition, Dewey stated he was a "consultant in the case." However, Dewey also stated he was hired "to assist with the facts of the case." Upon further questioning, Dewey stated he is an expert in "some fields" involved in the case, but did not know whether he was going to testify as a fact witness or an expert witness. When counsel for appellees attempted to question Dewey further about his characterization as an expert, the basis for his expert opinions on "some" of the fields at issue in the lawsuit, and what expert fields Dewey expected to opine on at trial, Dewey refused to answer the questions. He also refused to answer questions about whether he reviewed records of Clark Brothers' Farm provided to him by counsel. While we agree the trial court could have imposed a less-severe sanction for the discovery violation, it was within the trial court's discretion to exclude Dewey as a witness because Dewey's non-responses to the questions made it challenging, if not impossible, for either appellees or the trial court to determine whether Dewey's testimony was expert testimony or lay witness testimony.

{¶112} Even if the trial court committed error in excluding Dewey's testimony, we find such error to be harmless. As noted above, Jay contends Dewey was not going to testify as an expert witness, only a fact witness, proffering that the purpose of Dewey testifying was to "provide jury and this court with the context and the facts underpinning this dispute." We find the specific proffered testimony Dewey was allegedly going to provide was cumulative to that of other witnesses at trial. As to Dewey's proffered testimony concerning Artie's statement that Jay would receive the farm and that the farm was doing well, the testimony is cumulative to Guyer's testimony that Artie stated Jay would one day receive the farm and that Jay did a good job on the farm. Further, Dewey's

lay witness testimony about the "history" of the farm was cumulative to the testimony provided by Jay himself, Jay Laymon, Joel White, Beverly Gorley, Ron Guyer, and Al Davis. As to Dewey's testimony about how losing the farm impacted Jay, this testimony is cumulative to the testimony provided by Joel White, Beverly Gorley, Al Davis, Dalton Stepp, Austin Wogan, and Dawn Clark. Additionally, any testimony of "Jay's attempts to reconcile this dispute before litigation" is not relevant. Because any testimony would have been cumulative and/or irrelevant to Jay's claims, the exclusion of the testimony did not impact Jay's substantial rights and did not impact the outcome of the trial. See *State v. Granderson*, 2008-Ohio-3757 (5th Dist.) (error harmless because cumulative testimony); *State v. Caldwell*, 2014-Ohio-4486 (testimony cumulative, so harmless error); *State v. Thoen*, 2024-Ohio-5720 (5th Dist.); *King v. CSX Transp., Inc.*, 2009-Ohio-1471 (6th Dist.); *In re S.L.*, 2016-Ohio-5000 (3rd Dist.).

**{¶113}** Jay's ninth assignment of error is overruled.

X.

**{¶114}** In his final assignment of error, Jay contends the trial court committed error in denying his post-trial request for statutory indemnification of fees and costs incurred.

**{¶115}** After trial, Jay filed a motion for statutory indemnification of attorneys' fees and costs. Jay asserted that $557,460.48 in attorney fees of the total of over $750,000 in attorney fees billed by Baker Hostetler (counsel for Jay) in this case were directly related to Jay's defense of the counterclaims asserted against him. The trial court issued a judgment entry denying the motion because Jay did not "incur" the fees requested because Dewey paid all the attorney fees and costs. The trial court found that since there was no legal obligation for Jay to reimburse Dewey for the funds expended, the "obligation

to fund this legal endeavor never fell upon" Jay. The trial court noted the statute's language of "actually incurred" to support its denial.

{¶116} Jay contends that since he prevailed on the counterclaims asserted against him, he is entitled to statutory indemnification pursuant to R.C. 1701.13(E)(3). Jay argues he is liable for Baker Hostetler's fees, and that Ohio courts have found a party incurs fees even if the fees are paid by a third party.

{¶117} It is well-established that an award of attorney fees is within the sound discretion of the trial court. *Lepsky v. Lepsky*, 2022-Ohio-4710 (5th Dist.). At issue in this case is R.C. 1701.13(E)(3), which provides as follows: "to the extent that a director * * * employee * * * or other agent has been successful on the merits or otherwise in defense of any action, suit, or proceeding, * * * or in defense of any claim, issue, or matter in the action * * * the person shall be indemnified against expenses, including attorney's fees, actually and reasonably incurred by the person in connection with the action, suit or proceeding."

{¶118} The engagement letter Jay has with Baker Hostetler is signed by both Jay and Dewey and provides, "Dewey is the third-party designated by you to assume payment responsibility for and pay your legal bills. Mr. Dewey is not the client, but by singing below agrees to pay our fees and expenses." Further, that Jay would be responsible for the legal fees and costs in the "event that timely payment is not received from Mr. Dewey." The affidavit submitted by Jay attached to his post-trial motion states: Dewey has paid his attorney fees and expenses to date in this lawsuit; there is no agreement between him and Dewey regarding this lawsuit or its fees and expenses; and I [Jay] will assign any

award for attorneys' fees and expenses to Dewey because he has paid my attorneys' fees and expenses.

{¶119}   Jay testified at his deposition that Dewey offered to pay all of his (Jay's) legal bills if he sued Artie to get the farm back.  Jay testified he does not get the bills, nor does he know how much Dewey paid Baker Hostetler.  Jay stated he does not have any agreement to reimburse Dewey for the legal expenses Dewey paid on Jay's behalf.  At trial, Jay testified that Dewey is paying his legal bills, and Dewey has requested nothing of Jay in return for Dewey's payment of Jay's legal fees.  At his deposition, Dewey testified there is no contract between him and Jay, and he (Dewey) has paid all of Baker Hostetler's fees in this case.

{¶120} We find the cases cited to by Jay are distinguishable from the instant case. First, both cases dealt with R.C. 2323.51(B), the frivolous conduct statute.  *State ex rel. Striker v. Cline*, 2011-Ohio-5350; *Reddy v. Singh*, 2015-Ohio-1180 (3rd).  The statute at issue here is not R.C. 2323.51(B) and there is no allegation of frivolous conduct.  Further, neither of these cases involved the factual scenario in this case, i.e., a third-party relative of the party paying all of his fees without any expectation or obligation of repayment. Rather, they involved payment by an insurance company and/or a "write off" of certain fees, neither of which are involved in this case.  In *Striker*, the Supreme Court stated that its holding and interpretation was limited to the frivolous-conduct statute and specifically stated the rationale for its interpretation of that statute is that "a contrary interpretation would penalize parties that have the foresight to obtain liability insurance and would condone frivolous conduct against them.  We refuse to construe the frivolous-conduct statute to produce such an unreasonable result."  No such "unreasonable" result has

occurred in this case. In *Reddy*, the court rationalized that there was a chance the "write off" would not occur, or the party "writing off" the attorney fees could change his mind. Here, there was no "write off," and the party (Dewey) paying the attorney fees has not changed his mind; rather, he paid the entire attorney fee and expense bill.

{¶121} We find the trial court did not abuse its discretion in denying the motion for attorneys' fees and expenses. To quality for indemnification under R.C. 1701.13(E)(3), the fees and expenses must be "actually incurred" by the person. Black's Law Dictionary defines "incur" as "to suffer or bring on oneself (a liability or expense)." Black's Law Dictionary (12th Ed. 2024). "Actual" is defined as "existing in fact; real." *Id.* As demonstrated by the testimony and evidence, Jay had no legal obligation to pay the attorneys' fees because Dewey paid them all. Only upon Dewey's non-payment would Jay have been legally obligated to pay them. Further, Jay did not voluntarily pay any of the expenses. Jay did not "in fact" or "really" have to pay the fees because Dewey paid them. Accordingly, Jay did not "actually incur" either the attorneys' fees or the expenses as required for indemnification by the plain language of R.C. 1701.13(E)(3).

{¶122} Jay's tenth assignment of error is overruled.

Cross-Appeal Assignment of Error I.

{¶123} Appellees/cross-appellants Clark Brothers, Artie, Rusty, and Lisa argue the verdict of $82,000 in favor of Jay on the breach of fiduciary duty as the majority shareholder claim is against the manifest weight of the evidence.

{¶124} In *Eastley v. Volkman*, 2012-Ohio-2179, the Ohio Supreme Court clarified the standard of review appellate courts should apply when assessing the manifest weight of the evidence in a civil case. The Ohio Supreme Court held the standard of review for

manifest weight in criminal cases stated in *State v. Thompkins*, 78 Ohio St.3d 380 (1997) is also applicable to civil cases.

{¶125} A verdict can only be set aside on weight of the evidence in a case where the trier of fact clearly lost its way and created a manifest miscarriage of justice; every reasonable presumption is to be made in favor of the factfinder who occupies the best position to evaluate the demeanor, gesture, and voice inflections of the witness in order to adjudge credibility. *Id.* A factfinder may believe all, part, or none of the testimony of any witness who appears before it. *MCM Home Builders, LLC v. Sheehan*, 2019-Ohio-3899 (5th Dist.). As an appellate court, we are not factfinders; we neither weigh the evidence nor judge the credibility of the witnesses. *Id.* Our role is to determine whether there is relevant, competent, and credible evidence upon which the factfinder could base its judgment. *Id.* Generally, a civil judgment which is supported by competent and credible evidence may not be reversed as being against the manifest weight of the evidence. *Id.*

{¶126} Appellees'/cross-appellants' argument is two-fold. First, because counsel for Jay stated in his closing argument that Jay sought $32,759 on the breach of fiduciary duty claim based on Artie's status as majority shareholder, the assessment of $82,000 in damages is against the manifest weight of the evidence. Second, because Jay prevailed on a claim for breach of fiduciary duty against Artie due to her position as majority shareholder, the $82,000 should be reimbursed to the company directly, and Jay should only get a portion of that amount which is based upon his shares of stock.

{¶127} In Ohio, it has long been held that the assessment of damages is so thoroughly within the province of the jury that a reviewing court is not at liberty to disturb

the jury's assessment, absent an affirmative finding of passion and prejudice or a finding that the award is manifestly excessive. *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St.3d 638 (1994). To support a finding of passion or prejudice, it must be demonstrated that the jury's assessment of the damage was so overwhelmingly disproportionate as to shock reasonable sensibilities. *Jeffrey Allen Industries, L.L.C. v. Manco*, 2014-Ohio-268 (5th Dist.). We find there is no evidence of passion or prejudice, nor was the award excessive. As noted by Jay, the jury found Artie liable as the majority shareholder in the amount of $82,000, a sum that mirrored Artie's $82,677 salary. At trial, Jay presented an exhibit entitled "Cash Compensation Summary" in which it totaled Artie's "total compensation" to herself as $82,677. Thus, we find there is relevant competent and credible evidence upon which the jury could base its judgment.

{¶128} Appellees'/cross-appellants' also argue counsel for Jay asked for $32,759 on the claim the jury found in favor of Jay on and such was a "judicial admission" of damages during his closing argument. We find this does not constitute a judicial admission as the entire tenor of the trial does not indicate Jay's counsel intended to "dispense with formal proof of material facts," especially in light of the fact that the compensation summary was an exhibit entered into evidence, and counsel specifically stated in closing argument that the breach was based upon Artie's allegedly inflated or "stealth" salary. *Palmer v. Hopkins*, 2007-Ohio-3026 (11th Dist.).

{¶129} As to appellees'/cross-appellants' second argument that the damages assessed by the jury belong to Clark Brothers rather than to Jay individually, we agree a breach of fiduciary claim against the majority shareholder claim occurs when a shareholder manipulates control over a close corporation to unfairly acquire personal

benefits owing to or not otherwise available to minority shareholders. *Edelman v. JELBS*, 2015-Ohio-5542 (10th Dist). Thus, appellees/cross-appellants make a strong argument that the funds should be returned to the company rather than to Jay individually.

{¶130} However, we find neither Clark Brothers, nor Artie personally, properly brought this issue before the trial court. The jury instructions, jury interrogatories, and jury verdict forms all state the claim is against Artie, as majority shareholder, with the verdict being in favor of Jay individually. Neither Clark Brothers nor Artie individually objected to the verdict forms, interrogatories, or jury instructions. Further, the cases cited by Clark Brothers and Artie are cases in which the issue was brought to the attention of the trial court through the filing of a motion for new trial or motion for judgment notwithstanding the verdict. Neither Clark Brothers, nor Artie in her individual capacity, filed any of these motions. "It is well-established that a party cannot raise any new issues or legal theories for the first time on appeal." *Large v. Lilley*, 2018-Ohio-1017 (5th Dist.). The failure to raise the issue before the trial court operates as a waiver of the right to assert such for the first time on appeal. *Id.* Accordingly, to the extent that the verdict should have been rendered in favor of the company rather than Jay individually, we find the issue to be waived. The first assignment of error is overruled.

{¶131} Based on the foregoing, appellant and cross-appellants' assignments of error are overruled.

{¶132} The judgment entries of the Licking County Court of Common Pleas are affirmed.

By Gwin, J.,

Delaney, P.J., and

Wise, J., concur